## In re MERTENS et al.

(District Court, N. D. New York. January 17, 1905.)

1. BANKRUPTCY—SECURED CLAIMS—INSURANCE POLICIES—OWNERSHIP.

    Where it appeared on the face of one of the notes secured by insurance policies on the life of one of the members of a bankrupt firm that the firm pledged the policies, it would not be assumed, in determining the validity of the claim on the notes, that the firm had no interest in the policies.

2. SECURITIES—FRAUDULENT SALE.

    Bankr. Act July 1, 1898, c. 541, § 57, subd. "h," 30 Stat. 560 [U. S. Comp. St. 1901, p. 3443], provides that the value of securities held by secured creditors shall be determined by converting them into money according to the terms of the agreement, or by arbitration, compromise, or litigation, as the court may direct, and that the amount of such value shall be credited on the claims, and a dividend paid only on the unpaid balance. *Held*, that where a creditor of a bankrupt firm held insurance

policies on the life of one of its members of the face value of $60,000 as security, it had no authority to sell the same to itself at a pretended sale at auction for $10,250, after a petition in bankruptcy had been filed against the firm, but before adjudication, without other authority than the contract of pledge, and without notice to the pledgors or other parties in interest.

3. SAME—CLAIMS—DISALLOWANCE.

A sale so fraudulently made warranted the disallowance of the creditor's claim secured by the policies.

In Bankruptcy. See 131 Fed. 507, 972.

This is the review of orders of C. L. Stone, Esq., referee in bankruptcy, refusing to allow two certain amended claims presented by the Varick Bank, of the city of New York—one for $27,564.47, against the firm or copartnership of J. M. Mertens & Co.; and the other for $9,118.37 against J. M. Mertens, a member of said copartnership, individually. The claim of said bank against the firm is founded in the main on the notes of said company indorsed by said J. M. Mertens, and notes given to said firm by different parties and indorsed by the firm and said J. M. Mertens (second indorser), all discounted at said Varick Bank by said firm. The claim against J. M. Mertens individually is founded on his liability on said indorsements and his liability as signer of one or more of the notes as maker with the company. The bank held certain collateral, which it claims to have converted into cash, and applied to the payment of the claim against J. M. Mertens. Six thousand dollars of this collateral was a deposit in said Varick Bank standing to the credit of J. M. Mertens individually. The balance of the collateral consisted of two life insurance policies upon the life of said J. M. Mertens— one for $50,000 and the other for $10,000. The bank claims that it lawfully disposed of such policies for $10,221, pursuant to the contract under which held, and applied the proceeds, with such deposit of $6,000, on the claim against said J. M. Mertens (asserting that he owned and pledged the collateral), and that they may prove and have allowed the debt arising on these notes to the full amount against the firm or copartnership, and for the full amount, less such credits ($6,000 and $10,221), against the indorser, J. M. Mertens. Objections having been filed by the trustee to the allowance of each claim, mainly on the ground that the value of such collateral had not been properly ascertained or credited, that the value of the policies has not been ascertained as provided by subdivision "h," § 57, Bankr. Act July 1, 1898, c. 541, 30 Stat. 560 [U. S. Comp. St. 1901, p. 3443], the referee disallowed both claims as matters stand, and made an order prescribing a method for ascertaining the value of such policies.

Fried & Czaki, for claimant Varick Bank.

Lewis & Crowley, for trustee.

RAY, District Judge (after stating the facts). It is insisted by the Varick Bank that the policies of insurance were the property of J. M. Mertens individually, the copartnership having no interest therein, and that hence the claim against J. M. Mertens & Co. was not a secured claim. The trouble with this contention is the amended claim does not so show or state, and in one note at least the policies are pledged in writing by the firm as well as by J. M. Mertens as owner. As such policies were assignable, this court will not assume they were owned solely by J. M. Mertens individually. By subdivision 23, § 1 of the act to establish a uniform system of bankruptcy throughout the United States, approved July 1, 1898 (30 Stat. 545, c. 541 [U. S. Comp. St. 1901, p. 3419]), it is provided:

" 'Secured creditor' shall include a creditor who has security for his debt upon the property of the bankrupt of a nature to be assignable under this

act, or who owns such a debt for which some indorser, surety, or other persons secondarily liable for the bankrupt has such security upon the bankrupt's assets."

It does not appear, and this court will not assume, that the firm did not own at least an interest in these policies, when, upon the face of one of the notes it appears that the company pledged them as security for one of the notes in question. If the Varick Bank relies upon the assignments made by Jacob M. Mertens and Jacob M. Mertens and wife of the policies in question, then we find in such assignments no agreement for the sale of such policies in the mode and manner they were disposed of by the bank. But, however this may be, it is evident to the court that the referee was correct in refusing to allow these claims. Between the date of the filing of the petition and the date of the adjudication the Varick Bank, without notice to any one, delivered these policies to one of its agents or attorneys, with instructions to sell the same at public auction at the New York Real Estate Sales Rooms in the city of New York, and on the same day that said policies were thus delivered to the attorney or agent the designated attorney offered said policies for sale at said place to the highest bidder. No notice of said proposed sale was given to any person except the bank, and, as it was doing the selling, no notice to the bank was required. Only one bid was made, which was for the sum of $10,250, made by an attorney for the bank in the name of another representative of the bank, and payment was made to the auctioneer by this purchaser with money furnished by the Varick Bank prior to his going to the sales rooms, and, strange to say, the bank had furnished the attorney the exact amount of money for which the policies were sold. This attorney of the bank took the policies into his possession, but it is conceded that he was acting for the bank, used the money of the bank to pay for the policies, and thenceforth held the policies for the bank, except that he procured a loan of the Knickerbocker Trust Company upon the strength of said policies for $10,250, and subsequently for the further sum of $2,622.75. The loan procured of the Knickerbocker Trust Company for $10,250 was delivered to the Varick Bank, and was evidently procured for that bank. I find no statement as to what was done with the $2,622.75 since loaned on the strength of said policies by the Knickerbocker Trust Company.

It is evident that the Varick Bank, on learning of the filing of the petition in bankruptcy, took advantage of the situation to get possession of these policies as owner without making a fair, honest, open, public sale, if it purposed to sell at public sale, and without any attempt to make a fair, honest, private sale of the policies. The bank made no effort whatever to ascertain the true value of these policies. It did not attempt to sell them to any person at private sale. It purported to sell at public auction. There is no pretense that at this sale, made at the Real Estate Sales Rooms, any information was given to the bystanders, if any there were, as to the age or situation of the insured or the nature or character of the policies. It does not appear that even the amount was stated.

A public sale, under the agreement contained in the notes, presupposes a fair, honest, public sale; a sale under such conditions that persons present, who might desire to purchase, would have some understanding of the nature or character and value of the property offered. There was no bidder except the Varick Bank, and it took the policies at the precise sum it had handed its attorney when the direction was given for the sale to be made. This court has no hesitancy in declaring this transaction fraudulent. The purpose of the bank in carrying through this sham sale was to get possession of these policies as absolute owner at its own price, if possible, under the pretense of a sale, the effect of which would be to defraud the creditors of the bankrupts, J. M. Mertens and J. M. Mertens & Co. Such a transaction ought not to be sanctioned, and this court refuses to sanction or approve it. The referee states, in substance, that the transaction was the same as if the Varick Bank had said, "we will take these policies at a certain sum of money, and credit that sum on the indebtedness." This is putting the case mildly. While it is true that it was a fixing of the sum by the bank that the bank was willing to credit on the indebtedness for the policies, which would have been an honest transaction even if not a legal sale of the policies or a compliance with the terms of the agreement under which it held, the transaction as it actually occurred was more than that, and was intended to be more. It was intended to be a mere formal compliance with the terms of the agreement under which the policies were pledged as collateral security without being in fact a compliance therewith. The intent and purpose was to transfer the absolute title to the bank, and cut off all right of redemption without notice to any of the interested parties under the mere form and pretense of a public sale. The bank knew, and the attorneys conducting the proceedings must have known, that the transaction did not measure the value of the policies by a public sale thereof. This transaction did not constitute a compliance with the terms of the agreement under which the bank held the policies as collateral.

There is still another view to be taken of this transaction. As between the bank and J. M. Mertens, it is conceded that the bank was a secured creditor. Subdivision "h" of section 57 of the bankruptcy act of July 1, 1898, c. 541, 30 Stat. 560 [U. S. Comp. St. 1901, p. 3443], provides:

"The value of securities held by secured creditors shall be determined by converting the same into money according to the terms of the agreement pursuant to which such securities were delivered to such creditors or by such creditors and the trustee, by agreement, arbitration, compromise, or litigation, as the court may direct, and the amount of such value shall be credited upon such claims, and a dividend shall be paid only on the unpaid balance."

It is evident that the act contemplates a determination of the value of securities held by secured creditors in one of two ways— either by converting the same into money, according to the terms of the agreement pursuant to which such securities were delivered to such creditors, or by the joint action of the creditors and trus-

tee pursuant to an agreement, arbitration, compromise, or litigation entered into by them; and that the court may direct the ascertainment of the value of such securities in either manner. It does not lie with the secured creditor to dispose of the securities to himself at a price fixed by himself under the pretense of a sale, public or private, and then say the value has been fixed by a public or private sale to himself, and the court has nothing further to say regarding the transaction. The court thinks the bank is in error, and that the referee was right, and that the court has power to direct the determination of the valuation of these policies by either a public or private sale under such circumstances and after such inquiry and notice as shall guaranty to some extent at least, that a fair valuation has been arrived at.

This pretended sale took place between the filing of the petition and the date of the adjudication. The filing of a petition in bankruptcy is a caveat to all the world, and operates as an attachment and an injunction. From the filing of the petition until the adjudication the property rights of the debtor are in abeyance. Bank v. Sherman, 101 U. S. 406, 25 L. Ed. 866; Mueller v. Nugent, 184 U. S. 1, 22 Sup. Ct. 269, 46 L. Ed. 405. Suits against a bankrupt, if founded on a claim from which a discharge would be a release, are to be stayed until after the adjudication; and in Bank v. Sherman, supra, the court said:

"The filing of the petition was a caveat to all the world. It was, in effect, an attachment and injunction. Thereafter all the property rights of the debtor were ipso facto in abeyance until the final adjudication. * * * Those who dealt with his property in the interval between the filing of the petition and the final adjudication did so at their peril."

The provisions in the notes giving the bank the right to sell at public or private sale without notice, etc., were intended to furnish a remedy to the bank. Without impairing the obligation of the contract, it was perfectly competent for the act to suspend the exercise or enforcement of these remedies until after the adjudication. The act has done this, and hence these acts of the Varick Bank constituting the pretended sale of the policies in question were in violation of the act, and void. Conceding, for the sake of argument, that the bank might sell at public or private sale after adjudication, even without notice, it could not so sell before adjudication.

In the opinion of the court the exercise of the power of sale by the bank was and is subject to the supervision and control of the court. While it would not deprive the bank of its right to have the value of these policies determined under the provisions of the contract, it has the power and should see to it that the bank exercises those powers honestly, fairly, justly, and in such a manner as to honestly determine with reasonable certainty the actual value of the securities in question.

The orders of the referee disallowing the claims are approved and affirmed.