## VAN KIRK v. VERMONT SLATE CO. et al.

(District Court, N. D. New York. August 16, 1905.)

1. BANKRUPTCY—LIFE INSURANCE POLICIES—EFFECT OF BANKRUPT'S DEATH.

The right of a bankrupt to a life insurance policy having a cash surrender value provided for in the contract on payment of such value to the trustee as provided in Bankr. Act July 1, 1898, c. 541, § 70a (5), 30 Stat. 566 [U. S. Comp. St. 1901, p. 3451], is not affected by his death after adjudication, but passes to his legal representatives; nor is such right lost by the failure of the bankrupt or such representatives to make a tender of the surrender value until the expiration of 30 days after such value has been ascertained and stated to the trustee by the company.

2. SAME—POLICIES HAVING CASH SURRENDER VALUE.

The proviso to Bankr. Act July 1, 1898, c. 541, § 70a (5), 30 Stat. 566 [U. S. Comp. St. 1901, p. 3451], giving a bankrupt the right to retain "any insurance policy which has a cash surrender value" on payment of such value to the trustee, applies only to policies which, by their provisions, give the bankrupt the right to surrender the same and receive a fixed or ascertainable sum therefor, and policies giving no such contract right pass to the trustee as assets of the estate as of the date of adjudication, free from any right or claim of the bankrupt.

3. SAME—VALID PLEDGE OF POLICY—RIGHTS OF PLEDGEE.

A bona fide assignee of life insurance policies pledged more than four months before the bankruptcy of the pledgor is entitled to hold the same against the trustee in bankruptcy, and on application to the court to have their value determined pursuant to Bankr. Act July 1, 1898, c. 541, § 57h, 30 Stat. 560 [U. S. Comp. St. 1901, p. 3443], for the purpose of fixing the credit to be made on his claim.

4. SAME—DEATH OF BANKRUPT PLEDGOR AFTER ADJUDICATION—RIGHTS OF PARTIES IN INTEREST.

More than four months prior to his bankruptcy the bankrupt made a bona fide assignment of three life insurance policies as security for a debt, one of the policies having a cash surrender value and the others not. After the adjudication the pledgee reassigned the policies to another creditor of the bankrupt, receiving a sum therefor which he credited on his debt, and thereafter proved the remainder as an unsecured debt. Before any proceedings had been taken with respect to the policies, the bankrupt died, and they became payable, the amount exceeding the debt of the original pledgee. *Held* that, whatever rights the reassignment may have given as between the parties thereto or as against the bankrupt's administrators by reason of his assent thereto, it did not affect the right of the trustee, which was to redeem the policies on payment of the amount of the debt of the original pledgee and any sums which had been advanced by way of premiums, his redemption being subject, however, to the right of the administrators to retain the policy having a cash surrender value on payment of such value; that the debt so secured by the pledge should be apportioned between the different policies, and the amount apportioned to the policy having a cash surrender value taken pro rata from such surrender value, which belonged to the trustee, and the excess above such value, which belonged to the bankrupt's administrators; that the amount so required to be paid by the trustee in redemption of the policies should be distributed between the original pledgee and his assignee in accordance with their equities growing out of the assignment, subject to the requirement that the excess claim filed by the former against the bankrupt estate should be expunged.

In Equity. Action to determine the title to certain moneys derived from certain life insurance policies on the life of the bankrupt, William H. Hughes, who died after the adjudication in bankruptcy.

Alpheus T. Bulkeley, for trustee.
Edgar T. Brackett, for administrators and Ellis Williams.
S. E. Everts, for D. D. Woodard.
John Gilroy, for Vermont Slate Co.

RAY, District Judge. In July, 1903, the bankrupt, a resident and inhabitant of the state of New York, now deceased, made a general assignment for the benefit of his creditors. Thereupon, July 17, 1903, a petition in bankruptcy was filed against him, and on the 4th day of September, 1903, he was duly adjudicated a bankrupt. September 29, 1903, the plaintiff, Charles C. Van Kirk, was duly elected trustee in bankruptcy of the estate of said bankrupt, and, having qualified, entered on the discharge of his duties as such, and still is such trustee. On the 11th day of November, 1903, said William H. Hughes died intestate at Granville, Washington county, N. Y., and thereafter, and on the 30th day of November, 1903, the defendants Julia F. Hughes, his widow, and Ellis Williams, were duly appointed administrators of the estate, etc., of said deceased, and duly qualified, and now are such administrators. On the 13th day of July, 1895, the Mutual Life Insurance Company of New York issued its endowment policy No. 704,315 on the life of said William H. Hughes in the sum of $10,000, payable to the said William H. Hughes, his executors, administrators, or assigns, on the 13th day of July, 1915, but, if he should die before that time, then to his executors, administrators, or assigns. The annual premium was $259.10, payable semiannually on the 13th days of January and July, respectively, in each year. On the 4th day of December, 1894, the New York Life Insurance Company issued its policy No. 647,676, in the sum of $5,000, on the life of said William H. Hughes, payable to the executors, administrators, or assigns of the said William H. Hughes upon proof of the death of the insured. The annual premium thereon was $252.50, payable December 4th each year. On the same day said New York Life Insurance Company issued its other policy No. 647,677 for the same amount, $5,000, on the life of said Hughes, on the same terms as to payment, the premiums and time of payment thereof being the same as in No. 647,676. The premiums on these policies had been duly paid, so that each was valid and in full force at the time of the death of said Hughes. Said William H. Hughes, at the time of his adjudication in bankruptcy, September 4, 1903, was 40 years of age, and his expectancy of life was 27.61 years. The policies issued by the New York Life Insurance Company did not contain, nor did either of them, any provision for a cash surrender value, nor was there any agreement, not contained in the policies, fixing or providing a cash surrender value. The policies issued by the New York Life Insurance Company contained provisions whereby, if death occurred during the first 15 years of life of the policy, the company would pay the holder $5,000; if after the fifteenth year, it would pay increasing sums up to the twentieth year. If Hughes were living at expiration of 20 years from date of policy, he might exercise certain

options continuing the policy as paid-up insurance and receiving certain annuities for life, one of said options being to then surrender said policy "for its cash value, which is hereby guarantied shall not be less than $5,000," and which might, in addition, include certain surplus. Each also contained a provision that the company would make advances as loans upon the policy as collateral at or after the fifth year of the policy's life, from the sixth to the tenth years not to exceed $875, from the eleventh to the fifteenth years not to exceed $1,975, from the sixteenth to the twentieth years not to exceed $3,360; said loans to run as long as borrower should elect, not exceeding the end of the twentieth year period, and bearing interest at 5 per cent. They also contained agreements that, in case the payment of premiums were discontinued after they had been paid until December 4, 1902, the insurance of $5,000 would, if there were no indebtedness against the policy, be extended until December 4, 1914, and, if insured were then living, he would be paid $1,595; or the policy might be converted into nonparticipating paid-up endowment insurance to mature at the end of the accumulation period for the amount of $2,000. Greater benefits to the assured were provided for in case premiums should be paid to later dates. The policies were incontestable after one year from issue.

It is stipulated and agreed in writing by all the parties that "on the 21st day of September, 1903, the said Mutual Life policy" (of $10,000, issued by the Mutual Life Insurance Company) had "a cash surrender value of $2,219, and each of the two said New York Life policies had a cash loan value of $875." Each of these policies issued by the New York Life had a value (not a fixed or a definite market value) which the insurance companies would have been willing to pay on or for their surrender; also a loan value; but no value which the holder could have demanded and enforced for their surrender, or the surrender of either of them, if not voluntarily paid. On the 27th day of November, 1901, said William H. Hughes and Julia F. Hughes, his wife, for value received, made, executed, and delivered to the defendant Daniel D. Woodard their two certain promissory notes, dated that day, each for the sum of $5,000, each of which was indorsed by said William H. Hughes, who had the consideration, and on the 27th day of February, 1902, said Woodard held and owned said notes. On that day—February 27, 1902—said William H. Hughes assigned all the said insurance policies to said Woodard as collateral security for the payment of said notes by written assignments, each like the following, except in description of the policy assigned, viz.:

"For one dollar to me in hand paid, and for other valuable consideration (the receipt of which is hereby acknowledged), I hereby assign, transfer and set over to Daniel D. Woodard whose P. O. Address is Granville, Wash. Co., N. Y., all my right, title and interest in his policy No. 704315 issued by the Mutual Life Insurance Company of N. Y. and for the consideration above expressed I do also for myself, my executors and administrators, guarantee the validity and sufficiency of the foregoing assignment to the above named assignee, his executors, administrators and assigns, and their title to the said policy will forever warrant and defend. It being understood that the as-

signment of the above policy is for the purpose of securing a note of $5,000 made Nov. 27, 1901 by W. H. Hughes and Julia F. Hughes to D. D. Woodard or any renewal of same and upon the payment of said note or any renewal thereof this assignment shall become null and void.            W. H. Hughes."
"W. C. Clark.

"Dated in Granville, N. Y., this 27th day of February 1902."

Defendant Julia F. Hughes, wife of said William H. Hughes, was merely an accommodation maker of said notes. On the 21st day of September, 1903, while Woodard still held said notes and such collateral under such agreement, and 17 days after Hughes had been adjudicated a bankrupt, but several days before the appointment of a trustee, with the verbal consent and approval of said William H. Hughes, the following agreement in writing (omitting the acknowledgments) was made and executed by and between the parties thereto, defendants Daniel D. Woodard and the Vermont Slate Company, and same was duly delivered, viz.:

"Memorandum of Agreement Made this the 21st day of September, 1903, between Daniel D. Woodard of Granville, N. Y., and the Vermont Slate Company of the same place:

"Whereas, said Woodard is the holder of three certain insurance policies on the life of William H. Hughes as collateral security for two notes of five thousand dollars ($5,000.00) each, due November 27, 1903, made by Julia F. Hughes and endorsed by said W. H. Hughes, as follows:—one of ten thousand dollars ($10,000.00) in the Mutual Life Insurance Company of New York, and two of five thousand dollars ($5,000.00) each in the New York Life Insurance Company: and

"Whereas, the present value of the policy in the Mutual Life Insurance Company is given by the Company at twenty-two hundred nineteen dollars ($2219.00): and

"Whereas, the New York Life Insurance Company report that there is no market value for the other policies, but will loan thereon the sum of eight hundred seventy-five dollars ($875.00) each: and

"Whereas, said Woodard has also paid as premium on the said policy of ten thousand dollars ($10,000.00) in the Mutual Life Insurance Company, the sum of two hundred sixty dollars and forty-five cents ($260.45):

"Now, it is agreed that said Woodard has sold to the said Vermont Slate Company his interest in said security for the sum of five thousand seven hundred sixty dollars and forty-five cents ($5760.45) and applied the same in payment of said premium of two hundred sixty dollars and forty-five cents ($260.45) and in payment of one of said notes of five thousand dollars ($5,000.00) and five hundred dollars ($500.00) upon the other of such notes of five thousand dollars ($5,000.00); and this sale and transfer of the interest of said Woodard is made, subject to the approval of the United States District Court of Bankruptcy, and to its direction in the premises.
"D. D. Woodard.
"The Vermont Slate Co.,
"By J. G. Williams Treas."

This agreement and sale was made, as will be seen, "subject to the approval of the United States District Court of Bankruptcy and to its direction in the premises." This approval and direction is now sought in this action. On the execution and delivery of said agreement said Vermont Slate Company paid to said Woodard the sum of $5,760.45, who applied same as follows, viz.: $260.45 he paid as premium on one or more of said policies to keep it alive; $5,000 he applied in payment of one of said notes; and the balance, $500, he indorsed and applied on the other note of $5,000. November

11, 1903, William H. Hughes died as stated. At the time of his death neither of the said insurance companies had ascertained and stated to the trustee in bankruptcy of William H. Hughes the cash surrender value, or the value of the policy issued by it. The cash or other surrender value has not been stated to the trustee by either of the companies since. Nor has the trustee notified either said William H. Hughes in his lifetime, or his administrators since, of the cash surrender or other value of said policies. On the 28th day of September, 1903, the defendant Daniel D. Woodard duly verified and filed with the referee in bankruptcy his claim on such notes against the estate in bankruptcy of said Hughes, in which he set forth the notes, the pledge of the policies as security therefor, and then says:

"Deponent also held as collateral security for two notes made by Julia F. Hughes and indorsed by said William H. Hughes life insurance policies as follows: One of ten thousand dollars ($10,000) in the Mutual Life Insurance Company of New York; two (2) of five thousand dollars ($5,000) each in the New York Life Insurance Company, and the present market value for the policy in the Mutual Life Insurance Company of New York is twenty-two hundred nineteen dollars ($2,219), and the New York Life Insurance Company policies, according to their report, the loan value is eight hundred seventy-five dollars ($875.00) each; that on or about the 21st day of September, 1903, deponent entered into an agreement with the Vermont Slate Company, by which he assigned all his interest in said life insurance policies in consideration of five thousand seven hundred sixty dollars and forty-five cents ($5,760.45), subject to the approval of this court."

His claim was not objected to, and was allowed. In the schedules of the property of said bankrupt made September 15, 1903, said policies were included, and described with a statement that same were then pledged to said Woodard as collateral security for a loan. The schedules also said it was impossible to state the value of the policies. The trustee took no action or measures whatever in regard to said policies, or either of them, until January 4, 1904. On that day he demanded all the policies of both Woodard and the Vermont Slate Company, and tendered to said slate company the sum of $5,760.45. Neither Hughes nor any person in his behalf, nor the administrators, or either of them, nor any person in their behalf, has at any time paid, secured, or tendered to the trustee in bankruptcy the said value of either of said policies, nor have they or either of them refused so to do.

Each of said insurance companies, after the death of Hughes, paid the amount of the policy or policies issued by it, and said moneys are held in place of the policies subject to and awaiting the order of the court. The trustee in bankruptcy claims the whole of the fund, less the amount paid Woodard by the Vermont Slate Company. The Vermont Slate Company had a claim against Hughes of $4,000 (which it has proved against his estate in bankruptcy), and insists it was agreed that it was to have the policies as security for such debt, and that Hughes had the right to pledge his interest, whatever it was; or that it has the right to hold such proceeds to reimburse itself, and also to pay its claim to the extent of the interest of Hughes in any event, and that it can hold

all the proceeds Hughes or his estate was entitled to, as well as the amount Woodard was entitled to, including interest thereon. The administrators of Hughes insist that the policies that did not have a cash surrender value were worthless to the estate in bankruptcy, and did not pass to the trustee as assets, but belonged to or remained the property of Hughes, and now·belong to his estate, subject, of course, to any rights and equities of the Vermont Slate Company; that the policy that had a cash surrender value Hughes could have taken on paying such value, $2,219, and that, in effect, he did that by the transaction with the Vermont Slate Company; that, if such was not the effect of that transaction, the administrators can now·pay the cash surrender value to the trustee, and hold the proceeds of the policy. It is also claimed that, as the entire fund is in court, formal tenders are unnecessary. The Vermont Slate Company insists that the policies at the time of the adjudication in bankruptcy were pledged to Woodard for far more than they were worth, and, having been transferred by the pledgee with the assent of Hughes, the pledgor, to it for cash, $5,760.45—all they were worth at that time to the estate in bankruptcy—and the trustee having by silence acquiesced in such transaction, the title passed to the Vermont Slate Company, and it is now entitled to all the proceeds of the policies.

When William H. Hughes was adjudicated a bankrupt on the 4th day of September, 1903, these policies belonged to and formed a part of the assets of the estate in bankruptcy, subject to the rights and interests therein of the pledgee, Daniel D. Woodard; and the trustee on his appointment and qualification became vested with the title of the bankrupt as of the date of adjudication. Section 70, subd. "a," of an act entitled "An act to establish a uniform system of bankruptcy throughout the United States," approved July 1, 1898 (as amended Feb. 5, 1903), 30 Stat. 565, c. 541 [U. S. Comp. St. 1901, p. 3451]. In re Coleman (C. C. A.) 136 Fed. 818; In re Mertens et al. (D. C.) 131 Fed. 972; In re Welling, 113 Fed. 189, 51 C. C. A. 151; In re Slingluff, 106 Fed. 154, 5 Am. Bankr. Rep. 76; In re Diack, 3 Am. Bankr. Rep. 723, 100 Fed. 770; In re Holden, 7 Am. Bankr. Rep. 615, 113 Fed. 141, 51 C. C. A. 97. But policy No. 704,315, issued by the Mutual Life Insurance Company, for $10,000, had, it is conceded, a cash surrender value of $2,219, and, subject to the rights of the pledgee, Woodard, the bankrupt, William H. Hughes, was entitled to retain and hold and carry this policy as his own, provided he should within 30 days after the cash surrender value was ascertained and stated to the trustee by the company issuing the same, pay or secure to the trustee the sum so ascertained and stated. Should he do this, he was entitled to hold same free of all claims of his creditors. Should he fail to do this, the policy would pass to the assignee in bankruptcy as assets. Section 70, subd. "a," par. 5, Nat. Bankr. Act July 1, 1898, c. 541, 30 Stat. 566 [U. S. Comp. St. 1901, p. 3451]. The essential part reads:

"The trustee of the estate of a bankrupt, upon his appointment and qualification * * * shall * * * be vested by operation of law with the title of the bankrupt, as of the date he was adjudged a bankrupt, except in so far as it is to property which is exempt to all * * * (5) property which prior to the filing of the petition he could by any means have transferred or which might have been levied upon and sold under judicial process against him: provided, that when any bankrupt shall have any insurance policy which has a cash surrender value payable to himself, his estate, or personal representatives, he may, within thirty days after the cash surrender value has been ascertained and stated to the trustee by the company issuing the same, pay or secure to the trustee the sum so ascertained and stated, and continue to hold, own, and carry such policy free from the claims of the creditors participating in the distribution of his estate under the bankruptcy proceedings, otherwise the policy shall pass to the trustee as assets."

This policy has never passed to the trustee in bankruptcy as assets of the estate he represents, for the reason that the insurance company issuing the policy has never stated to the trustee the cash surrender value thereof. Therefore the bankrupt in his lifetime was not, and the administrators of his estate since his death have not been, called upon or required to tender or pay or secure to the trustee the amount of such cash surrender value. I find no evidence or concession establishing that Hughes or his administrators have waived or lost the right to take and hold this policy on paying or securing to the trustee the cash surrender value thereof. I find no evidence or concession establishing as a fact that the trustee has surrendered the rights of the estate in such policy. It is true that he paid no attention to it until after the death of Hughes, but his neglect, if there was any neglect, did not operate to change title or affect the rights of the estate represented by him. The interest of the trustee in that policy on his appointment was $2,219, and it has never grown to any greater interest. The value of the policy to Hughes, beyond the cash surrender value, was uncertain and contingent. Had Hughes died the day after adjudication, the right to take and hold the policy on paying the cash surrender value on the day of adjudication would have vested in the administrators of Hughes when appointed. This right to take and hold such a policy is not personal to the bankrupt—not a right that is extinguished by his death, but one that survives to his executors or administrators. I cannot see why the right is not also assignable; but it was not assigned. There is a short statute of limitations, but this must be set running by having the company that issued the policy state the cash surrender value to the trustee. I do not think that Hughes lost his right because he did not procure this to be done. It appears that the company did state the cash surrender value to Mr. Woodard before the trustee in bankruptcy was appointed, but this in no way affected or bound the trustee in bankruptcy. Nor did this set the short or 30-day limitation running against Hughes. The concession made in writing, and signed by the respective attorneys for all the parties, reads as follows:

"On the 21st day of September, 1903, the said Mutual Life Policy had a cash surrender value of $2,219.00, and each of the two said New York Life

Policies had a cash loan value of $875.00. The foregoing value of each of the said policies was ascertained and stated by the insurance companies respectively issuing the same on or before the 21st day of September, 1903, to D. D. Woodard."

There is no pretense these values were ever stated to the trustee, or that he in any way sought to ascertain the values prior to the death of said Hughes, or even after.

The policies known as the New York Life policies, of $5,000 each, had a value. These were property belonging to the estate in bankruptcy. In re Coleman (C. C. A.) 136 Fed. 818; In re Mertens (D. C.) 131 Fed. 972. In Re Coleman, supra, the court said:

"But if policies have no cash surrender value, and yet would be redeemed by the insurance company, and a sum paid for them, that sum, so far as it grows out of payments by the bankrupt previous to the adjudication, should accrue to the trustee."

But they had no cash surrender value, and hence the bankrupt had no claim thereto after adjudication.

In re Welling (C. C. A. 7th Circuit) 7 Am. Bankr. Rep. 340–344, 113 Fed. 189, 51 C. C. A. 151; In re Mertens (D. C.) 131 Fed. 972. In Re Welling the Circuit Court of Appeals said (pages 344, 345, of 7 Am. Bankr. Rep., page 192 of 113 Fed., page 154 of 51 C. C. A.):

"We are of opinion—and therein we concur with the court below and with the referee—that this policy does not fall within the proviso. The term 'cash surrender value' therein employed has a defined and legal meaning, namely, the cash value—ascertainable by known rules—of a contract of insurance abandoned and given up for cancellation to the insurer by the owner, having contract right to do so. The 'surrender' of the proviso is not the subject of negotiation or agreement, but of right. The proviso does not include those policies where the right to surrender is not given by the contract."

The interest of the bankrupt therein passed to and vested in the trustee on his appointment and qualification as of the date of adjudication. Nothing done by the pledgor and pledgee after adjudication affected that title. It was not divested prior to the death of Hughes. The agreement for the sale of such policies by Woodard to the Vermont Slate Company, even if made with the knowledge and express consent of Hughes, did not pass any title or interest that went to the trustee. In equity, as between Woodard and the Vermont Slate Company, the company will be protected to the extent of the money it advanced to Woodard thereon, not in excess of the amount of Woodard's interest therein which he could and can hold as against the trustee in bankruptcy. In Re Mertens, 134 Fed. 101, this court held, in effect, that a sale of collateral held by a pledgee from a pledgor who had been adjudicated a bankrupt subsequently to making the pledge must be made under the direction of the court even when there was an express agreement as to the mode of sale, etc., and that such sale could not be made between the filing of the petition and the adjudication. See Bank v. Sherman, 101 U. S. 406, 25 L. Ed. 866; Mueller v. Nugent, 184 U. S. 1, 22 Sup. Ct. 269, 46 L. Ed. 405. It is also clear that, when made, it should be on notice to the trustee in bankruptcy. We come, then, to consider the relations of these parties and the

situation at the time of the adjudication and of the making of the agreement of sale, etc., which this court is now asked to approve.

More than four months prior to the filing of the petition in bankruptcy, and under circumstances and conditions that cannot be attacked as fraudulent, William H. Hughes transferred these policies, as he had the right to do, to Daniel D. Woodard, as security for the two notes of $5,000 each; in all $10,000. Woodard, as against the bankrupt and as against his creditors and as against the trustee in bankruptcy, was entitled to hold them, and all of them, until the notes and interest were paid, and in case such notes were not paid he had the right to apply to this court, and take proceedings to determine the value of such policies, etc. Subdivision "h" of section 57 of the bankruptcy act of July 1, 1898, c. 541, 30 Stat. 560 [U. S. Comp. St. 1901, p. 3443], provides:

"The value of securities held by secured creditors shall be determined by converting the same into money according to the terms of the agreement pursuant to which such securities were delivered to such creditors or by such creditors and the trustee, by agreement, arbitration, compromise, or litigation, as the court may direct, and the amount of such value shall be credited upon such claims, and a dividend shall be paid only on the unpaid balance."

On that subject this court said in Re Mertens, 134 Fed. 104, 105:

"It is evident that the act contemplates a determination of the value of securities held by secured creditors in one of two ways—either by converting the same into money, according to the terms of the agreement pursuant to which such securities were delivered to such creditors, or by the joint action of the creditors and trustee pursuant to an agreement, arbitration, compromise, or litigation entered into by them; and that the court may direct the ascertainment of the value of such securities in either manner. It does not lie with the secured creditor to dispose of the securities to himself at a price fixed by himself under the pretense of a sale, public or private, and then say the value has been fixed by a public or private sale to himself, and the court has nothing further to say regarding the transaction."

I am of the opinion that under all the concessions and evidence (conceding it to be admissible) no title or right to these policies, or any of them, passed to the Vermont Slate Company by virtue of the agreement of September 21, 1903, as against the trustee, so as to cut off or affect his right to redeem them and demand all the proceeds thereof on paying the notes and interest thereon and such sums as Woodard or said company might have paid as premiums to keep them alive. Of course, this right of the trustee to redeem did not and would not, if exercised, place title in him absolutely. His rights were subject to the right of the bankrupt, Hughes, to retain the policies, or such one of them as had a cash surrender value, on paying or securing to the trustee such value. Hughes never executed any assignment or transfer of his interest (right to take and hold the policy having a cash surrender value) to any person. It is claimed he agreed so to do. If he did, and such agreement may be enforced, it is a matter between the Vermont Slate Company and the administrators of Hughes. Possibly because of such agreement his administrators may be estopped, if Hughes was estopped, from holding, as against that company, the

part of the avails of the policies, or of the one policy, they would otherwise be entitled to.

It is clear and incontestable that Woodard had the right, on the death of Hughes, and before (aside from the agreement with the Vermont Slate Company), as between himself and the trustee and Hughes' administrators, whatever the interest of Hughes' estate might turn out to be, to hold and retain of the proceeds of the three policies, when paid by the insurers, such sum as would pay the notes and interest thereon, and any sum paid by him as premiums on such policies. The balance, if he collected the amount of the policies, he was bound to turn over to the trustee in bankruptcy. The trustee in bankruptcy, in his turn, was bound to pay to the administrators of Hughes the sum received by him on the policy having a cash surrender value on receiving from them such cash surrender value, if tendered or secured within 30 days after such value was ascertained and stated to the trustee by the insurer. Whatever the effect of the agreement or sale of the policies to the Vermont Slate Company made September 21, 1903, as between Woodard and that company, or between Woodard and the administrators of Hughes, it is evident that Woodard has never surrendered any part of his claim upon the proceeds of the policies to the trustee in bankruptcy. He has, however, put in a claim against the estate for such balance, stating all the facts, and has accepted a dividend. But this was not done on any theory that he had surrendered or intended to surrender to the trustee any interest in the policies or their proceeds. His purpose was to surrender it to the Vermont Slate Company and accept a dividend from the estate of the bankrupt for the balance of his claim on the notes about $4,500. But this, if carried out, might leave a claim against the estate of $4,500, about, that would have been wiped out, extinguished, if such transfer of the policies to the Vermont Slate Company had not been made. But it is said this transfer to that company extinguished its claim pro tanto, and hence the estate is not injured. At the time of the adjudication—September 4, 1903—the four policies, two of $5,000 each, or $10,000, having no cash surrender value, and one for $10,000, having a cash surrender value, stood pledged for the debt upon the notes held by Woodard, $10,000. William H. Hughes, the bankrupt, made the pledge, and Woodard, by virtue of the pledge, held and could claim every interest Hughes had or might have therein at any time before such policies were redeemed. The trustee took the title Hughes actually had; no more; and he took it subject to the incumbrances or charges thereon. But the interest the trustee took in the policies, those not having a cash surrender value, and the cash surrender value of the other, was not to bear alone the burden of the $10,000 incumbrance releasing to Hughes, or his estate after his death, the value of the policy having a cash surrender value over and above that cash surrender value. Nor was there any equity that will discharge the one policy in favor of the others, so far as the notes are concerned. Each must bear its share of the burden of the incumbrance—the notes of $10,000 and any interest accrued. The premium paid by Woodard,

$260.45, to keep the $10,000 policy alive, must be charged to it. In short, from the proceeds of the four policies the two notes are to be paid, the estate in bankruptcy to be reimbursed any dividend it has paid on the claim based thereon. This will reduce the proceeds of the policy having a cash surrender value to about $5,000. The policy was $10,000. The cash surrender value was $2,219. Deduct this, and the interest of the estate of William H. Hughes therein was $7,781. The interest of the trustee of the estate in bankruptcy was $2,219. But the incumbrance of $5,000 is 50 per centum, and is to be deducted, leaving the value of the interest of the administrators of Hughes in that policy $3,890.50, and the value of the interest of the trustee in bankruptcy therein $1,109.50. In the other policies the trustee owns the entire fund, less the incumbrance of $5,000, or $5,000. But Woodard and his assignee must, as a condition of retaining the amount of such notes, refund any dividends paid by the trustee in bankruptcy on the claim based on such notes, and may receive and hold the amount paid as premium on the Mutual Life policy, $260.45. This must come from and reduce the amounts above stated as the interests of the administrators and trustee in bankruptcy, respectively, of said Hughes, each paying their proportion.

We come, then, to the question, who is entitled to the $10,260, or thereabouts, not going to the administrators of the estate of Hughes and the trustee of his estate in bankruptcy? It is clear that in equity the Vermont Slate Company is to be reimbursed the money it advanced or paid to Woodard on the transfer to it of the policies, with interest. The transaction was in good faith. It was expressly provided that it was to be submitted to the court in bankruptcy for its approval or disapproval. The decisions applicable to the state of facts existing when that agreement was made were and are conflicting. There was authority for the proposition that Hughes owned at least two of the policies—those for $5,000 each—absolutely. In the written agreement of sale of September 21, 1903, between Daniel D. Woodard and the Vermont Slate Company, I find nothing indicating an intent to turn over the policies as security to such company for any claim it had against Hughes. The parties to that agreement ascertained the then value of all the policies, and Woodard got present cash more than that value, and would seem to have been willing to take that sum and release all his interest, which he did, subject to the approval of this court, to the Vermont Slate Company. He then presents a claim for $4,500 against the estate in bankruptcy, and it is proved and allowed, and not objected to by the trustee when appointed, and a dividend is paid thereon. Before the rights of the parties interested in the policies and the estate in bankruptcy had become fixed, Hughes died. The situation is changed. The trustee asserts rights he had not before claimed or mentioned. Under all the circumstances this court does not think it just or equitable to hold Woodard and the Vermont Slate Company to that agreement. It cannot permit the claim of Woodard for the balance to stand against the estate in bankruptcy. In fact, no such claim exists. Hughes executed no

transfer to the slate company. It would seem that the Vermont Slate Company and Daniel D. Woodard ought to agree as between themselves on the disposition of the fund aside from the $5,760.45. This court cannot ratify and approve the "Memorandum of Agreement" made September 21, 1903. The Vermont Slate Company, because of a mistake of both law and fact, is not getting what it in good faith bargained for and supposed it was getting. Nor is Woodard in the position he supposed he would be. As between Woodard and such company, the equities favor the latter; but it has not changed its position for the worse, and, aside from directing that such company be fully reimbursed, this court cannot find justification for decreeing that Woodard pay over th ' balance to that company, or that it be paid to it in preference to Woodard. There are expressions in the brief of Woodard's counsel seeming to concede the right of the company to all that may be awarded Woodard. If that be the purpose, it may be so entered in the decree by consent; but the dividend paid must be refunded, and no more paid. If the trustee in bankruptcy insists on the formality, the administrators of Hughes must tender, within 30 days after service on them of a copy of the decree made and entered in conformity herewith, the said sum of $1,109.50 as the cash surrender value, but the trustee may waive the formality.

A decree will be prepared in conformity to the principles indicated.